UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TOMMY E. HOLLY, an individual,

        Plaintiff,

-vs-                            Case No.  5:05-cv-192-Oc-10GRJ

CLAIRSON INDUSTRIES, LLC, a Florida
Limited Liability Company,

        Defendant.

_____

**O R D E R**

    This disability discrimination case is before the Court for consideration of the Defendant Clairson Industries, LLC's Motion for Summary Judgment (Doc.  15).  The Plaintiff has filed a response in opposition (Doc.  25), and the motion is ripe for review. Having considered the arguments of both parties, and for the reasons stated below, the motion is due to be granted.

**BACKGROUND**

    The following is a recitation of the material facts viewed in the light most favorable to the Plaintiff.  United States v.  Diebold, Inc., 369 U.S. 654, 655 (1962).

**A.**    **The Parties.**

    Clairson Industries, L.L.C. ("Clairson") is a custom plastics injection molder that produces molds for industrial and medical devices.  Clairson's production facility is located

in Marion County, Florida, and it has employed over 100 individuals during all relevant points in time.[1]  These employees worked one of three shifts throughout the day.

Tommy Holly ("Holly") is currently 42 years old and resides in Anthony, Florida, approximately 20 miles from the Clairson production facility.  Holly is a paraplegic, the result of a motorcycle accident in 1984.  He has no feeling from the waist down, suffers from various bowel and intestinal disorders, and is confined to a wheelchair for the majority of each day.  However, he is able to drive a motor vehicle.[2]

Holly began working for Clairson as a mold polisher in 1986.  In this position, Holly worked on the assembly line, polishing the steel tooling after it was formed from the molds.  The length of time it took for Holly to complete any given project could vary from 10 minutes to 80 hours.[3]  Over time, he also learned to operate other pieces of equipment and work other areas in the assembly line, particularly when the polishing work was up to date.  Holly was able to remain seated in his wheelchair while performing his job.

Holly was a good employee and well-respected by his supervisors.  Until the last year of his employment, he never received any negative reviews or disciplinary action other than comments on his annual reviews that he needed to curb his excessive tardiness.

**B.    Clairson's "No Fault" Attendance Policy**

---

[1]Deposition of Cloteen Kilkelly ("Kilkelly Dep."), pp.  7-8.

[2]Deposition of Tommy Holly ("Holly Dep."), pp.  4-5.

[3]Id., p.  40.

Prior to 2003, Clairson's attendance policy was not very strict. Although every employee's absences and lack of punctuality were recorded on a daily basis, employees were not generally disciplined for such behavior. Rather, if a supervisor felt that an employee was excessively absent or late, the supervisor would meet with the employee and counsel or otherwise discipline him.[4] Clairson would also address an employee's attendance and punctuality issues during the employee's annual evaluation. At that time the employee would be counseled and would receive a lower than normal raise as punishment for poor attendance.[5]

In 2003, however, Clairson changed its policy. In March of that year, Clairson hired Cloteen Kilkelly as an advisor to help Clairson revise its human resources policies and procedures, including employee benefits and the employee handbook.[6] Under Kilkelly's supervision, Clairson published a revised employee handbook in August of 2003, with numerous changes to its policies and benefits. One of the changes, pursuant to Kilkelly's recommendations, was a new "no fault" attendance policy.[7]

The new policy, which remains in effect today, is much stricter than Clairson's prior attendance policy. It establishes guidelines for the number of absences and tardies an

---

[4]Kilkelly Dep., p. 13; Deposition of Steve Nilson ("Nilson Dep."), pp. 10-11; Deposition of Dennis Miller ("Miller Dep."), pp. 12-13.

[5]Nilson Dep., p. 11.

[6]Kilkelly became Clairson's Executive Vice President in November 2003, and was promoted to President in April 2004. She holds that position to date. See Kilkelly Dep., pp. 4-5.

[7]Id., pp. 9, 12.

employee can accrue without discipline, as well as the corrective action an employee may be subject to.  It is a "no fault" policy and does not differentiate between excused or unexcused absences or tardiness, and even includes paid vacations.[8]  Employees cannot make up missed time or late arrivals by working late or skipping lunch, and they cannot avoid the policy by notifying their supervisor of an absence in advance.[9]  The only time an employee need provide medical documentation for an absence is when the employee is out of work for five or more consecutive days.[10]

The policy makes clear that attendance and punctuality are extremely important to the Company.

> Each employee is expected to work the hours normally scheduled for his or her position.  When employees fail to take attendance seriously, time-consuming rearrangements and costly replacements are often necessary to maintain our business activity.  Each employee is therefore responsible for reporting to work regularly and on time.[11]

---

[8]Exceptions to this policy were made during the hurricane season of 2004, when the Clairson production facility was shut down.  Medical emergencies were also handled on a case-by-case basis. Kilkelly Dep., p.  27-28.

[9]Kilkelly Dep., pp.  39-40.

[10]See Clairson Industries, L.L.C.'s Employee Manual ("Employee Manual"), attached as Exhibit 1 to Clairson's Motion for Summary Judgment (Doc.  19), p.  30.

[11]Employee Manual, p.  30.

> Attendance is an essential job function for all at the Company. Employees with American Disability Act situations are not exempt from this policy.[12]

The policy also emphasizes Clairson's concerns about tardiness:

> Tardy employees may delay assembly operations and force other employees to stand idle as the supervisor waits for unpunctual employees to report to work or until temporary replacements can be oriented and placed on the job. Employees who leave early also force supervisors to find temporary replacements.[13]

Pursuant to the policy, each employee's absence or late arrival is marked as an "occurrence," or increment thereof. For example, an employee who is late to work by even one minute, takes an excessively long break, or leaves prior to the completion of his shift, receives a .50 occurrence. A full-day absence is recorded as 1 occurrence. Absences that take place on consecutive days, regardless of their duration, are recorded as a single occurrence, and employees who do not notify their supervisor of an unplanned absence prior to the start of their shift are charged a double occurrence.[14]

The policy also sets forth a progressive corrective action or disciplinary schedule based on the number of occurrence points an employee receives. After receiving four

---

[12]Employee Manual, p. 31. Despite this pronouncement, Clairson did have a policy of complying with the ADA and making reasonable accommodations for qualified individuals with disabilities. Kilkelly Dep., p. 16; see also Employee Manual, pp. 16-17.

[13]Employee Manual, p. 31. This new attendance policy is also reflected in the revised employee handbook's "Standards of Conduct," which provide that "leaving work before the end of a workday or not being ready to work at the start of a workday without approval of your supervisor" may be grounds for disciplinary action, up to and including termination. Id., p. 22.

[14]Id., pp. 30-31.

occurrences, an employee is verbally counseled by his or her supervisor.   At six occurrences, the employee receives a written reminder.   After the next, or seventh occurrence, the employee receives a second written reminder.   Employees who accrue nine occurrences within a twelve month period are terminated.  In addition, employees who are absent for three consecutive days without notifying Clairson are considered a voluntary termination.[15]

The new policy also has a reduction provision.   For each 90 day period that an employee has no attendance or punctuality issues, Clairson will remove one occurrence from the employee's time records.   In addition, occurrences are removed from the employee's time records one year from the date they accrue.[16]

Clairson records each employee's time through an automated time clock system. The time clock is located in the employee break room, against one of the walls.  Originally, Clairson employed a time card system, whereby employees would line up in the break room, locate their time card on a rack on the wall, insert it into the time clock so that the card would be time and date stamped, and return the time card to the rack.  In January 2004 Clairson upgraded the system to one that reads hand prints.  The employee now

---

[15]Id., p.  31.

[16]Id., p.  32.

simply lines up and places his or her hand on a sensor, which reads the employee's hand print and records the time and date on a computerized attendance record.[17]

Clairson allows its employees to clock in up to five minutes prior to the beginning of their shift, in part to account for any wait time resulting from employees lining up by the time clock.[18]  Because the employees were split upon among three different shifts, at no time were all one hundred employees attempting to clock in at the same time.  During Holly's shift, he worked with approximately 21 other employees.[19]

## C.   Holly's Punctuality Problems

Holly has always had problems arriving at work on time throughout his employment with Clairson; some years he was late to work 10 times, other years as many as 80 times.[20] The majority of these issues derived from his paraplegic condition and the fact that he was confined to a wheelchair.[21]  For example, sometimes he was late by one or two minutes because there were pallets or other materials partially blocking the entrances and walkways in the the facility, and he would have difficulties maneuvering around them.[22]  He occasionally was a few minutes late either because he was at the end of the employee line

---

[17]Kilkelly Dep., pp.  14-15.

[18]Holly Dep., p.  9.

[19]Kilkelly Dep., p.  38.

[20]Nilson Dep., p.  14.

[21]Holly Dep., p.  42.

[22]Id., pp.  9, 12-13.

at the time clock and did not get to the clock in time, or he had difficulties reaching the time clock from his wheelchair.[23]   Holly also would be late when it was raining, because he parked at the back of the parking lot and could not operate his wheelchair and an umbrella at the same time.[24] In such situations, Holly would remain in his truck until the rain stopped or lessened sufficiently so he could reach the production facility without getting completely wet.[25]   On other, more rare occasions, Holly would be late by one or more hours because of his bowel and intestinal disorders.[26]   Holly would also be late at times for reasons not related to his physical condition, such as traffic or car issues.[27]   When Holly was more than a few minutes late, he would notify his supervisor in advance.[28]   When he was only a few minutes late, he would explain his tardiness to his supervisor upon his arrival.   All of his supervisors were aware of his medical condition.

---

[23]Holly Dep., p.  9.

[24]Id., pp.  32, 38.  At the inception of his employment with Clairson, Holly received a handicapped parking spot close to the front door of the production facility, and very near to the employee break room. During the first few years of his employment, Holly used this space.  One of his then-supervisors, Gary Bennett, asked him to park in the back of the parking lot because Holly's truck leaked oil, causing a messy and dangerous situation in the parking lot.  Holly soon after purchased a new truck that did not leak oil, but continued to park in the back of the lot, despite retaining the handicapped spot, because he "got used to parking out back."  Id., p. 23.

[25]Holly Dep., pp.  32, 38.

[26]Holly Dep., pp.  7, 41; Nilson Dep., p.  13.

[27]Holly Dep., p.  32.

[28]Nilson Dep., p.  13.

During the time he worked at Clairson before it instituted the "no fault" attendance policy, Holly did not receive any written warnings for his chronic tardiness.  Instead, his supervisors would occasionally meet with him on an informal basis and verbally counsel and/or warn him that he needed to improve his punctuality.[29]  His supervisors also noted on several of his annual evaluations that he was frequently tardy (in part due to his medical condition) and that he needed to work to improve his tardiness.  At least one of his supervisors reduced the amount of Holly's annual raise due to his chronic tardiness.[30]

One of Holly's supervisors, Steven Nilson, occasionally would allow Holly to work past the end of his shift to make up any time missed through his tardiness.[31]  However, this was solely at Nilson's discretion and depended on whether the workload allowed; it was not Clairson policy and Nilson did not seek the approval of anyone higher up in the Company before allowing Holly to work late.

Holly's tardiness continued after the institution of Clairson's no fault attendance policy.[32]  Pursuant to the policy, Holly received a verbal counseling on October 1, 2003.  At that time, Holly had accrued four occurrences, based on eight instances of tardiness.  Each time, Holly was late to work by only one minute.  Holly received his second verbal

---

[29]Nilson Dep., p.  27.

[30]Nilson Dep., p.  11; Miller Dep., p.  7.

[31]Nilson Dep., p. 12.

[32]Holly admits that he was well aware of the attendance policy from its date of inception.  See Holly Dep., 11.

counseling on February 12, 2004, after accruing another occurrence, based on his continued tardiness.  On February 16, 2004 Holly arrived late to work by almost one hour, and on March 11, 2004, Holly was five minutes late to work.  This resulted in another occurrence, and a written warning.  At this point, Holly had six occurrences.[33]

On April 14, 2004, Holly received his second written warning.  At that time, Holly had seven occurrences.  He had been late to work on April 9, 2004 by one minute and on April 13, 2004 by six minutes.  Holly continued to clock in to work late, and was tardy by one minute on April 22, 2004, April 23, 2004, and April 28, 2004, and tardy by five minutes on April 27, 2004.  As a result, Holly accrued another two occurrences, making a total of nine occurrences.  Pursuant to the no fault attendance policy, Clairson terminated Holly's employment on May 3, 2004.[34]  Holly's supervisor Nilson attempted to reverse Holly's termination, but was told by Clairson's Human Resources Department that the termination was final, and that no exceptions could be made to the attendance policy.[35]

Following the institution of Clairson's no fault attendance policy, Holly complained twice about the clock-in procedures, stating that his disability prevented him from clocking in on time.  On the first occasion, Holly complained to his supervisor that the time clock was located too high up on the wall, and that he had trouble reaching it from his wheelchair.

---

[33]See Exhibits 2-4, attached to Clairson's Motion for Summary Judgment (Doc.  19); Holly Dep., pp.  15-18.

[34]See Exhibits 5-6, attached to Clairson's Motion for Summary Judgment (Doc.  19); Holly Dep., pp.  19-21.

[35]Nilson Dep., p.  22, 24.

Clairson immediately lowered the time clock so Holly could reach it more easily.[36]   On the second occasion, Holly complained that a break table had been placed in front of the time clock, preventing him from clocking in on time.  Again, Clairson quickly removed the table.[37]   Other than these two complaints, Holly never requested any accommodations for his disability or alterations to the "no fault" attendance policy.  Holly also never challenged any of his disciplinary actions under the attendance policy, although he did refuse to sign the written warnings and his termination documentation.[38]

## E.   Procedural History

Following his termination, Holly filed a charge of disability discrimination with the Equal Employment Opportunity Commission.  The Commission issued a Notice of Right to Sue on January 25, 2005.  Holly subsequently filed this lawsuit in the Circuit Court for the Fifth Judicial Circuit in and for Marion County, Florida, on March 18, 2005 (Doc.  2). The lawsuit alleges two claims of disability discrimination: Count I alleges that Clairson terminated Holly because of his disability and failed to provide him with a reasonable accommodation in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*  ("ADA").  Count II alleges the same disability discrimination claim under the Florida Civil Rights Act, Fla.  Stat. § 760.01, *et seq.,* ("FCRA").  Count III is a state law claim for

---

[36]Holly Dep., p.  26.

[37]<u>Id.</u>, p.  10.

[38]<u>Id.</u>, pp.  15-21.

intentional infliction of emotional distress, also centering on Holly's termination and Clairson's alleged failure to accommodate Holly.[39]

Clairson removed the action to this Court pursuant to 28 U.S.C. § 1331 on April 13, 2005, (Doc. 1), and Holly has never challenged the removal.  Following the completion of discovery, Clairson filed its motion for summary judgment on March 1, 2006 (Doc. 15).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward

_____

[39]Holly's Complaint contains language suggesting that Clairson follows a company-wide pattern and practice of discrimination against all disabled employees.  See Complaint, ¶¶ 7-8. However, Holly has not otherwise styled this case as a class action, and has not sought relief on behalf of any other Clairson employees.  Holly also has included language to the effect that he is also seeking relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq..  See Complaint, ¶ 4.  It appears that the inclusion of Title VII is a scrivener's error, as none of the three Counts set forth in the Complaint involve allegations of discrimination covered by Title VII, and there is nothing in the record demonstrating that any alleged violations of this Act have occurred. This case is simply an individual claim of disability discrimination.

with "sufficient evidence of every element that he or she must prove." <u>Rollins v. Techsouth</u>, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## **Discussion**

### I.    Disability Discrimination Claims

Both the ADA and FCRA prohibit employers from discriminating in employment against otherwise qualified individuals with a disability.[40] To resolve a claim of disability discrimination, both statutes apply the burden-shifting analysis set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000). Using this burden-shifting approach, Holly must first establish a <u>prima</u> <u>facie</u> case of discrimination by showing that: (1) he has a disability; (2) he is a "qualified individual with a disability;" and (3) Clairson unlawfully discriminated against him because of his disability. <u>Hilburn v. Muarata Electronics N.A., Inc.</u>, 181 F.3d 1220, 1226 (11th Cir. 1999); <u>LaChance v. Duffy's Drafthouse, Inc.</u>, 146 F.3d 832, 835 (11th Cir. 1998). If Holly is able to establish his <u>prima</u> <u>facie</u> case, the burden then shifts to Clairson to come forward with a legitimate, nondiscriminatory reason for his discipline and termination. If Clairson establishes such a reason, Holly must then prove by a

---

[40]<u>See</u> 42 U.S.C. § 12101; Fla. Stat. § 760.11. The FCRA follows the same standards and applies the same law as the ADA. <u>See</u> <u>Chanda v. Engelhard/ICC</u>, 234 F.3d 1219, 1221 (11th Cir. 2000); <u>Downing v. United Parcel Service, Inc.</u>, 215 F. Supp.2d 1303, 1308-09 (M.D. Fla. 2002); <u>see also</u> <u>Smith v. Avatar Properties, Inc.</u>, 714 So.2d 1103, 1106-07 (Fla. 4th DCA 1998).

preponderance of the evidence that the proffered reasons are pretextual.  See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Earl, 207 F.3d at 1365.[41]

There is no dispute that Holly suffers from a disability as defined under the ADA,[42] and Clairson does not challenge that portion of Holly's prima facie case.  Clairson instead contends that Holly cannot establish that he was a qualified individual with a disability.  As discussed below, the Court agrees.

### A.    Holly is Not a Qualified Individual With a Disability

In order to satisfy this prong of his prima facie case, Holly must prove that he is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).   Clairson does not contend that Holly did not perform his job adequately when he was at work, but rather argues that his excessive tardiness prevented him from performing those functions.   In other words, Clairson contends that Holly's on-time presence is an essential element of his job that he failed to satisfy, regardless of accommodation.

"Essential functions" are the fundamental job duties of a position that an individual with a disability is actually required to perform.  Earl v. Mervyns, Inc., 207 F.3d 1361, 1365

---

[41]Holly can also establish that he was discriminated against by providing direct evidence of discrimination.  See, e.g. Johnson v. Boardman Petroleum, Inc., 923 F. Supp. 1563 (S.D. Ga. 1996).   No such evidence has been submitted to the Court, therefore Holly may only proceed under the burden-shifting approach based on circumstantial evidence of discrimination.  See Earley v. Champion Int'l Corp.., 907 F.2d 1077, 1081 (11th Cir. 1990).

[42]See 42 U.S.C. § 12101(2).

(11th Cir.  2000).  It is well established that regular attendance and punctuality is an essential function of most jobs.  See Earl, 207 F.3d at 1366-67 (punctuality is essential job function); Hilburn, 181 F.3d at 1231 (employee is not a "qualified individual with a disability" when the employee cannot meet the employer's attendance requirements for the job); Price v.  Facility Mgmt.  Group, Inc., 403 F.Supp.  2d 1246, 1258-59 (N.D. Ga.  2005) (employee's attendance and punctuality problems rendered him unable to perform his most basic job functions); Pittman v.  Moseley, Warren, Prichard & Parrish, No.  3:01-CV-279-J-21-TJC, 2002 WL 2007880 (M.D. Fla.  July 29, 2002) ("An individual is not qualified for his job if he is unable to meet the attendance requirements of the job."); Rocky v.  Columbia Lawnwood Regional Medical Center, 54 F.  Supp.2d 1159 (S.D. Fla.  1999) ("if the nature of an employee's position requires her to regularly and reliably attend work, and she fails to meet that requirement, then she is not qualified for her job.").  See also Tyndall v.  Nat'l Educ.  Ctrs., 31 F.3d 209, 213 (4th Cir.  1994) (an employee must be willing and able to demonstrate, for an ADA claim, the skills necessary to perform the job in question by coming to work on a regular basis).

In addition, when assessing whether a particular function is "essential," the Court may consider written job descriptions for the particular position, as well as company policies and employee handbooks that discuss the functions.   Moreover, the ADA specifically provides that "consideration shall be given to the employer's judgment as to what functions of the job are essential."   42 U.S.C. § 12111(8); see also 29 C.F.R. §

1630.2(n)(3).  In the present case, the Court finds ample evidence that punctuality was one of Holly's essential job functions.  Clairson's attendance policy makes clear that all employees are expected "to be at work and on time each scheduled workday," and further emphasizes the necessity of attendance and punctuality by establishing a detailed corrective action process which includes termination.  Every employee is made well aware of this policy.  The policy also states that tardy employees "may delay assembly operations and force other employees to stand idle."[43]  In addition, Kilkelly testified that employee tardiness and attendance was a concern for the Company.[44]  See, e.g. Earl, 207 F.3d at 1366.

Holly, however, argues that punctuality was not an essential function of his job because his work was not time sensitive.  The fact that his polishing projects, by themselves, were not necessarily performed under strict deadlines does not mean that attendance and punctuality were not essential functions.  As Holly himself testified, some of his polishing jobs would take several hours, or even several days.  By not arriving to work on time, he was slowing down his production, increasing overhead, and potentially increasing overtime costs.  And Holly could not perform his job from home or some other location.  See Jackson v. Veterans Admin., 22 F.3d 277, 279 (11th Cir. 1994). Moreover, it is within the employer's discretion to determine what job functions are essential and it is

---

[43]Employee Manual, p. 31.

[44]Kilkelly Dep., pp. 8-9.

beyond dispute that Clairson made attendance and punctuality essential functions, both through its discipline of employees and clearly established policies.

Finally, Holly argues that punctuality cannot be an essential job function because he was not disciplined for his tardiness during the 16 years prior to Clairson's no fault attendance policy.   This arguments fails for two reasons.   First, Holly has provided no support for this argument, and the Court is aware of no authority that prevents an employer from changing job functions or job requirements after an employee is already hired. Indeed, such a position would tie the hands of employers and prevent them from operating their businesses through changing economies and environments.  Thus, even if Clairson suddenly decided to make punctuality an essential function of the mold polisher position, it was entirely within its right to do so, and it is not the function of the Court to micro-manage such corporate practices.  See Conneen v.  MBNA America Bank, N.A., 182 F.Supp.2d 370, 378 (D. Del. 2002).   Second, the undisputed facts demonstrate that Holly was reprimanded and counseled about his chronic tardiness, and that his raises were lower than normal as a result.   Thus, Clairson's focus on attendance and punctuality, while perhaps more strict in recent years, was not a novel position.[45]   The requirement that employees such as Holly actually report to work on time was always an essential element

---

[45]The fact that one of Holly's supervisors occasionally allowed Holly to work late to make up his late arrivals is also of no weight.   It is undisputed that there was no company policy, ever, that permitted employees to simply work late or skip lunch in order to make up missed time.  The actions of one lax supervisor do not destroy the "essential" nature of the attendance and punctuality requirements.

of Holly's job as a mold polisher.  See Willis v.  Conopco, Inc., 108 F.3d 282, 287 (11th Cir. 1997).

The undisputed facts further demonstrate that Holly was not able to perform this essential job function.  Despite numerous coaching sessions and warnings, Holly's punctuality remained sporadic and unpredictable.  Holly simply could not fulfill the essential job function of punctuality, and therefore is not a "qualified" individual.  See Earl, 207 F.3d at 1366; Price,  403 F.Supp.  2d at 1258-59; Pittman, No.  3:01-CV-279-J-21-TJC, 2002 WL 2007880; Rocky, 54 F.  Supp.2d 1159.

This does not end the analysis, for if Holly can identify a reasonable accommodation that would allow him to have performed his essential job functions, then he will have satisfied this prong of his prima facie case.  Holly contends that had Clairson honored his requested accommodation - that he be allowed to clock in whenever he wanted without repercussion  - he would have been able to perform all functions of his job and therefore be a "qualified individual." First, it bears noting that Holly never made such a request throughout his employment at Clairson.  It is only during discovery in this case that he first claimed he was entitled to such an accommodation.   The Court therefore questions whether it can even consider this accommodation at this late stage.  See e.g., Terrell v. USAir, 132 F.3d 621, 624 (11th Cir.  1998) ("[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual.") (internal citations omitted); Stewart v.  Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir.  1997) ("The burden of identifying what would allow a qualified employee to

18

perform the essential functions of her job rests with that employee"). <u>See also</u> <u>Jovanovic</u> <u>v.  In-Sink-Erator</u>, 201 F.3d 894, 899 (7th Cir.  2000) (an employer's duty to provide a reasonable accommodation is not triggered until the employee puts the employer on notice that an accommodation is necessary).  In any event, this suggested accommodation is not reasonable.

If an employee suffers from a recognized disability, the ADA requires "covered entities . . . to provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [it] can demonstrate that the accommodation would impose an undue hardship.' "  <u>Toyota Motor</u> <u>Mgf., Ky., Inc.  v.  Williams</u>, 534 U.S. 184, 193 (2002); 42 U.S.C. § 12112(b)(5)(A). <u>See</u> <u>also</u> <u>Morisky v.  Broward County</u>, 80 F.3d 445, 447 (11th Cir. 1996).  However, the ADA does not require employers to reallocate or eliminate essential job functions in order to accommodate an employee, because such an accommodation would impose an undue burden or hardship on the operations of the employer's business.  <u>See</u> 29 C.F.R. §§ 1630.2(o)(2), (p); 42 U.S.C. § 12111(10)(A).  But that is exactly what Holly is requesting - that Clairson ignore its attendance policy and allow Holly to eliminate the essential job function of punctuality  - and come and go as he pleases.  Such a request is not reasonable or required under the ADA or FCRA.  <u>See</u> <u>Earl</u>, 207 F.3d at 1366-67 (request to arrive at work at any time, without reprimand, would in essence require employer to change the essential functions of employee's job, and thus is not a request for a reasonable accommodation); <u>Salmon v.  Dade County School Bd.</u>, 4 F.  Supp.  2d 1157,

1162-63 (S.D. Fla.  1998) (allowing school counselor to arrive late as needed would eliminate essential function of the employee's job - to arrive on time - and is not a reasonable accommodation).

In addition, an accommodation is reasonable "only if it enables the employee to perform the essential functions of the job." LaChance v.  Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir.  1998); 29 C.F.R. § 1630.2(o)(2)(ii).  It is Holly's burden to both identify the accommodation and show that it is reasonable.  Willis, 108 F.3d at 283.  This Holly cannot do.  Allowing Holly to arrive at any time would not aid him in performing his job functions; to the contrary, he would simply continue to fail to perform his job functions by not being at work on time.[46]  This requested accommodation would also not correct any of Holly's punctuality problems that are not based on his disability - such as his continued refusal to utilize his handicapped parking space or traffic or other weather related issues.  Thus, Holly cannot establish that his requested accommodation would allow him to perform the essential job function of punctuality.  It is therefore not a reasonable accommodation, and the Court cannot find any reasonable accommodation that would permit Holly to show

---

[46]For one thing, the "accommodation" does not address Holly's disability.  If he is able to report to work ten minutes late he could just as easily report on time by simply starting his morning routine ten minutes earlier - the same remedy any non-disabled employee would apply.  Clearly, therefore, the "accommodation" would simply excuse his own unwillingness to deal with one of the consequences of his disability; it would not alleviate any symptom of the disability itself such as lowering the time clock or removing the barrier of the table.

up for work in his sporadic or unpredictable manner.[47]  <u>Vaughn v.  Nationsbank Corp.</u>, 137

F.  Supp.2d 1317, 1326 (N.D. Ga.  2000).

      *B.    Clairson Did Not Unlawfully Discriminate Against Holly.*

      Even if Holly were to establish that he were a qualified individual with a disability, or

that punctuality was not an essential function of his job, Holly's claim of disability

discrimination would still fail because he cannot satisfy the third prong of his <u>prima</u> <u>facie</u>

case:  that he was subject to unlawful discrimination on the basis of his disability.[48]

      A review of the record fails to identify any evidence supporting this portion of Holly's

<u>prima</u> <u>facie</u> case.  Simply put, Holly has not identified a single comparator[49] or put forth a

---

[47]In fact, Clairson complied with the two requested accommodations Holly did make while an employee – (1) that the table partially blocking his access to the clock-in station be removed; and (2) that the clock-in machine be lowered so he could reach it more easily – and Holly continued to arrive late to work.  In addition, there is evidence in the record that Holly was told to simply arrive to work ten minutes earlier each day, which would eliminate any issues Holly had with objects blocking his path in the warehouse, and allow him to be in line to clock in prior to the start of his shift.  Although it does not appear that Holly made such an adjustment, even if he had, he still did not arrive to work on time.

[48]The Court recognizes that Clairson has not expressly challenged Holly's <u>prima</u> <u>facie</u> case on this ground, although it has argued that Holly has failed to demonstrate any evidence of discrimination, but the lack of evidence of any discrimination is so overwhelming, that the Court shall consider this as an alternative ground for summary judgment.

[49]One of Holly's supervisors, Dennis Miller, stated at his deposition that he believed other non-disabled employees were allowed to ignore the attendance policy without repercussion.  <u>See</u> Miller Dep., pp.  17-18.  However, in addition to also stating that Holly was not treated differently from any other employee, <u>Id.</u> at 32-33, Miller provided no evidence to support this belief, and admitted that he did not know that such activities were in fact occurring.  <u>Id.</u> pp.  37-38.  Holly also has not provided any evidence to support Miller's supposition, and therefore Miller's statements do not establish unlawful discrimination against Holly.  Opinion and speculation, without more, carry no weight and cannot work to defeat summary judgment.  <u>See</u> <u>Carter v.  City of Miami</u>, 870 F.2d 578, 585 (11th Cir.  1989); <u>Grigsby v.  Reynolds Metals Co.</u>, 821 F.2d 590, 597 (11th Cir. (continued...)

single shred of evidence that he was treated differently from any non-disabled employee who violated Clairson's attendance policy.[50]  To the contrary, he repeatedly admits that the policy applied to everyone, without exception.[51]  In fact, he is not even entirely sure that he was discriminated against, and admitted that he was not treated differently because he used a wheelchair.[52]  On the other hand, Clairson has put forth evidence that four non-disabled employees were terminated between 2003 and 2004 for violating the attendance policy.[53]  Without any evidence to support his allegations of discrimination, Holly cannot establish his <u>prima</u> <u>facie</u> case, and his claims under the ADA and FCRA must fail.[54]

---

[49](...continued)
1987).

[50]Holly has also presented deposition testimony from Nilson that he, without prior Company approval, would allow some employees to work around the attendance policy by changing their work shift on a particular day if Nilson knew that the particular employee had a doctor's appointment or some other previously scheduled appointment that required the employee to be late to work or to leave early.  In such situations, Nilson would change the employee's work shift so that the employee would begin or end work in time to attend the appointment.  This does not create disparate treatment or evidence unlawful discrimination against Holly.  There is no evidence that Holly ever notified a supervisor that he had a pre-existing appointment and would like to start his work shift late or early and was denied this request.  In fact, there is no evidence that Holly ever requested a change in his work shift at all.  Moreover, this same supervisor also testified at deposition that Holly was not treated differently from any other employee at Clairson, that he allowed Holly on occasion to work late to make up his late arrivals, and that other non-disabled employees were disciplined for violating the attendance policy, even by one minute's tardiness.  <u>See</u> Nilson Dep., 28-29, 33.

[51]<u>See</u> Holly Dep., pp.  12, 22, 25-26, 29-30.

[52]<u>Id.</u>, pp.  23-24, 29.

[53]Kilkelly Dep., pp.  36-37.

[54]Because Holly cannot move beyond the <u>prima</u> <u>facie</u> case stage, there is no need to
(continued...)

II.      Intentional Infliction of Emotional Distress

Holly has also alleged a state law claim of intentional infliction of emotional distress.[55] To establish such a claim, Holly must prove: (1) he was subject to extreme and outrageous conduct; (2) Clairson intended to cause, or acted with reckless disregard to the probability of causing, emotional distress; (3) he suffered from severe emotional distress; and (4) that the conduct complained of caused his severe emotional distress. Williams v. City of Minneola, 575 So.2d 683, 691 (Fla. 5th DCA 1999); Liberti v. Walt Disney World Co., 912 F. Supp. 149, 1505 (M.D. Fla. 1995); Watson v. Bally Manufacturing Corp., 844 F. Supp. 1533, 1536 (S.D. Fla. 1993).

The question of what constitutes outrageous conduct is a matter of law to be resolved by the Court, see, e.g., Baker v. Florida National Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1990); Stockett v. Tolin, 791 F. Supp. 1536, 1555 (S.D. Fla. 1992), and courts in this Circuit applying Florida law have narrowly construed this cause of action in the employment setting. See Vance v. Southern Bell Telephone & Telegraph Co., 983 F.2d 1573 (11th Cir. 1993); Golden v. Complete Holdings, Inc., 818 F.Supp. 1495, 1499 (M.D. Fla. 1993). Sufficiently "outrageous" conduct has been found in the employment setting only when the plaintiff is able to show that he was the victim of "relentless physical, as well

---

[54](...continued)
address whether Clairson had any legitimate non-discriminatory reasons for terminating Holly, or whether he could establish that these reasons were pretextual.

[55]While the Court has the authority to dismiss this claim for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), in the interests of judicial economy and convenience, the Court will address the claim on its merits.

as verbal, harassment." <u>Vernon v. Margate</u>, 912 F. Supp. 1549, 1559 (S.D. Fla. 1996).

The Supreme Court of Florida has also given a narrow construction to this tort:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!"

<u>Metropolitan Life Ins. Co. v. McCarson</u>, 467 So.2d 277, 278-79 (Fla. 1985).

In this case, Holly fails to establish a cause for intentional infliction of emotional distress because the conduct he complains of was not sufficiently outrageous. Holly bases his tort claim on his termination under Clairson's "no fault" attendance policy and Clairson's failure to accommodate his disability. The Court has previously found that Holly's termination was not discriminatory, but simply a product of his chronic inability to arrive to work on time in violation of a non-discriminatory attendance policy, and that his requested accommodation was not reasonable. The Court further finds as a matter of law that the facts, even when read in the light most favorable to Holly, are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Accordingly, Holly has failed to satisfy a necessary element of the tort - that the conduct was extreme and outrageous, and Clairson is entitled to summary judgment on this claim as well.[56] <u>See</u>,

---

[56]The Court also finds that Holly has produced no evidence that he suffered any emotional (continued...)

e.g.,Fernandez v. Community Asphalt, Inc., 934 F. Supp. 418, 422-23 (S.D. Fla. 1996) (verbal abuse, threats to withhold economic benefits, and illegal termination of disabled employee do not rise to the level of intentional infliction of emotion distress under Florida law); Golden, 818 F. Supp. at 1499-1500 (termination of at-will employee was not sufficiently outrageous conduct to support intentional infliction of emotional distress claim).

## Conclusion

While Clairson's attendance policy may be strict to the point of being unreasonable in the eyes of some, it is not discriminatory towards persons who have disabilities. Rather, the undisputed evidence is that Clairson applies its policy equally to all employees. Thus, by his own admission, Holly cannot demonstrate that he was discriminated against because of his disability. He also cannot demonstrate that he was a "qualified" individual, given his chronic inability to be at work on time. While the ADA and FCRA focus on eradicating barriers based on disabilities, these laws do not relieve a disabled person from the obligation to perform the essential functions of his or her job. Rather, they are intended to enable disabled persons to compete in the work-place based on the same performance standards and requirements that employers expect of persons who are not disabled. See 29 C.F.R. § 1630, App. Background. When a disabled person cannot do so, he or she is not a "qualified individual" and has no recourse under either law. This is such a case.

---

[56](...continued)
distress at all, much less any severe distress, or that Clairson intended to cause him any distress.

Accordingly, and upon due consideration, Clairson Industries' Motion for Summary Judgment (Doc. 15) is GRANTED.  Clairson's Motion for Leave to File Additional Exhibits in Support of its Motion for Summary Judgment (Doc. 28) is DENIED as MOOT.  The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff, terminate any pending motions, and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 11th day of May, 2006.

_____

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record